## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**DEVONTE JETT**
c/o Hansel Law, P.C.
2514 North Charles Street
Baltimore, Maryland 21218

       *Plaintiff,*

    v.

**MAYOR AND CITY COUNCIL**
**BALTIMORE CITY**
c/o Ebony Thompson
City Solicitor
City Hall - Room 250
100 N. Holliday St,
Baltimore, Maryland 21202

    and

**BALTIMORE CITY**
**POLICE DEPARTMENT**
Richard Worley
Police Commissioner
601 East Fayette Street
Baltimore, Maryland 21202

    and

**OFFICER STEVEN REED (#I215)**
*Individually and in his Official*
*Capacity as a Baltimore City Police Sergeant*
601 East Fayette Street
Baltimore, Maryland 21202

    and

**OFFICER BRANDON BUTT (#K239)**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
601 East Fayette Street
Baltimore, Maryland 21202

      *Defendants.*

**\*Jury Trial Demanded\***

Case No._____

**COMPLAINT AND JURY DEMAND**

COMES NOW, Plaintiff Devonte Jett, by and through undersigned counsel, and the law firm of Hansel Law, P.C., and sues the above-named Defendants, stating as follows:

**INTRODUCTION**

1.      On the afternoon of June 14, 2021, 16-year-old Devonte Jett was run over by a Baltimore City Police issued Ford Explorer SUV driven by Baltimore City Police Sergeant Steven Reed (hereinafter "Defendant Reed").  Minutes prior, Mr. Jett had exited the vehicle that he was driving and was walking/running on the sidewalk.  Baltimore City Police Officer Brandon Butt (hereinafter "Defendant Butt") engaged in a foot pursuit of Mr. Jett and Defendant Reed joined the chase in his department issued SUV.

2.      Mr. Jett left the main sidewalk and ran into an open grassy area.  Instead of containing and arresting Mr. Jett through reasonable means, Defendant Reed either maliciously, intentionally, grossly negligently or negligently accelerated and steered the SUV directly toward Mr. Jett, running him over from behind.

3.      Mr. Jett was running in a straight line and at no point turned towards the SUV or otherwise caused the contact with the SUV to occur—it was all Defendant Reed's doing.

4.      As a result of being run over by Defendant Reed, Mr. Jett was immediately rendered unconscious and suffered severe injuries.

5.      Mr. Jett brings this civil action against Defendants for the deprivation of his constitutional rights.

**JURISDICTION AND VENUE**

6.      Jurisdiction is proper in this Honorable Court under 28 U.S.C. Code § 1331 because this is a civil action arising under the Constitution and laws of the United States.

Plaintiffs further invoke supplemental jurisdiction of this Court to hear and decide claims arising under state law, by virtue of 28 U.S.C. § 1367.

7.      Venue is proper in this Honorable Court under 28 U.S.C. §1391 because the Parties are domiciled in Maryland, or organized under Maryland Law, and the events at issue took place in Baltimore City, Maryland.

8.      Plaintiff complied with the notice requirements of the Local Government Tort Claims Act, Md. Code, Cts. & Jud. Proc., § 5-304 (hereinafter "LGTCA"), and the Maryland Tort Claims Act, Sections 12-101 *et seq.*, of the State Government Article (hereinafter "MTCA"), and Plaintiff is in full compliance with said Act(s) insofar as applicable to the instant case.  All conditions precedent to filing suit have been met.  Plaintiff seeks recovery against all Defendants as police officers and as individual civilians.  Plaintiff seeks recovery for multiple "incidents or occurrences" and multiple "individual claims" as described herein below.

9.      Mr. Jett reached the age of majority on December 24, 2022.

10.     The amount in controversy exceeds $75,000.

## **PARTIES**

11.     Plaintiff Devonte Jett (hereinafter "Mr. Jett" or "Plaintiff") is the aggrieved party in this suit and is an adult resident of Baltimore City, Maryland.

12.     Defendant Mayor and City Council Baltimore City (hereinafter "Defendant Baltimore City") is a body politic and corporate body that may sue and be sued.  Baltimore City is a proper party defendant because Baltimore City in fact controls, in all material respects, the Baltimore Police Department.  Baltimore City is responsible for the hiring, training, retention, supervision, discipline and funding of the Baltimore Police Department and its leadership, as well as all of the individual officers whose conduct is at issue here.  All of the considerations

taken into account in identifying an "employer" or otherwise resolving respondent superior liability weigh exclusively in favor of holding Baltimore City liable for the misdeeds of its police officers.  The State of Maryland has no meaningful input into any of these matters and no meaningful control over the Baltimore Police Department, its leadership or its officers.

13.     Defendant Baltimore Police Department (hereinafter "Defendant BPD") is a public entity established under the laws of Maryland.

14.     Defendant Officer Steven Reed (#1215) (hereinafter "Defendant Reed") was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer having the rank of sergeant, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.

15.     Defendant Officer Brandon Butt (#K239) (hereinafter "Defendant Butt") was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.

16.     All other unidentified Baltimore City police officers whose conduct is referred to herein were at all times relevant hereto employed by Baltimore City, and who are responsible for the pattern and practice of misconduct discussed herein and were at all times relevant hereto acting under color of state law.

17.     Defendants Baltimore City and BPD are hereinafter collectively referred to as the "City Defendants."

18.    Officers Steven Reed and Brandon Butt, along with additional unidentified officers, are hereinafter collectively referred to as "Defendant Officers."

19.    All Defendants are jointly and severally liable for damages and injuries to Plaintiff described herein.

### FACTS COMMON TO ALL COUNTS

20.    This case arises from Defendants' unlawful, unconstitutional, and excessive use of force, resulting in severe injuries to Mr. Jett and the deprivation of his constitutional rights.

21.    In June 2021, Devonte Jett was a 16-year-old minor living in Baltimore City with his family and attending High School.

22.    During the evening of June 14, 2021, a Pizza Boli's delivery driver was delivering food on the 1800 block of Druid Hill Avenue in Baltimore City, Maryland.

23.    When he arrived at his destination, he parked his vehicle, left the vehicle unlocked, and walked up to the home to complete the delivery.  The vehicle was still running, and the keys were left inside.

24.    As he was walking back to his vehicle, the delivery driver observed an unknown person get into his vehicle and drive away.  The person was wearing a grey hoodie and dark pants.

25.    The incident happened in a matter of seconds.  The delivery driver was at least 15 feet away from his vehicle when it was stolen.  He was not injured, he never came in contact with the individual, and he never got a clear look at the individuals' face.  He immediately reported the incident to 911.

26.    Baltimore Police Department Officer Aliyu Dabo was initially dispatched to the scene of the theft and then rerouted to the Pizza Boli's at 2014 North Charles Street.

27.     A description of the vehicle was put out over the police radio.  All officers were asked to be on the lookout for the delivery driver's stolen vehicle.  Baltimore City Police Defendant Reed observed the vehicle heading eastbound on Robert Street, which was approximately two blocks away from the 1800 block of Druid Hill Avenue, and then southbound on Eutaw Place.  Defendant Reed and at least one Central District Patrol Officer were in the area searching for the vehicle.

28.     The Baltimore City Police's Aviation Unit was then requested and responded to the area regarding the stolen vehicle.  Shortly after being notified, Baltimore City Police's helicopter "Foxtrot" was in the air assisting with the search and located the car.  Officer Edward Nero (hereinafter "Officer Nero") was the observer in Foxtrot, and he stayed in communication with the officers on the ground and called out the route of the stolen car in real time. Several units were following Foxtrot's direction and pursuing the stolen car.

29.     The car stopped in the 1000 block of North Fremont Street and the driver exited the vehicle and began walking on North Freemont Street.

30.     Foxtrot reported that a person now known to be Mr. Jett was walking westbound on Riggs Avenue.  Defendant Butt then saw Mr. Jett, exited his vehicle, and pursued Mr. Jett on foot, and Defendant Reed continued the pursuit in his department-issued Ford Explorer SUV with the number #896 identified on the roof.

31.     During the foot chase, Defendant Butt pointed his department-issued firearm at Mr. Jett on at least two separate occasions without cause or legal justification.  Mr. Jett ran in fear for his safety because a gun was being pointed at him.  Mr. Jett posed no threat to anyone present.

32.     Mr. Jett entered the alley behind the 1000 block of North Arlington Avenue, where Defendant Butt continued to pursue Mr. Jett on foot while Defendant Reed continued to pursue Mr. Jett in his SUV.

33.     Once in the alley, Mr. Jett ran to the right into a grassy area that was the backyard of a rowhome in an effort to reach safety.

34.     In response to this, Defendant Reed maliciously, intentionally, grossly negligently, or negligently turned his front bumper directly towards Mr. Jett and increased the speed of his vehicle.

35.     As Defendant Reed aimed his vehicle at Mr. Jett, Defendant Butt was less than 20 feet behind Mr. Jett on foot and was quickly closing in with three additional Police Officers running close behind.

36.     Defendant Reed then either maliciously, intentionally, grossly negligently or negligently *ran over* Mr. Jett with his SUV.  The front and rear passenger side tires crushed Mr. Jett's body, and he was immediately rendered unconscious and did not get up from the ground.

37.     Defendant Reed eventually stopped the vehicle several feet away from where Mr. Jett was lying.

38.     Instead of waiting for emergency medical personnel to arrive, or first assessing Mr. Jett medically in any way, Defendant Butt, with the aid of other officers, immediately and roughly handcuffed Mr. Jett and sat him in an upright position while he was still unconscious. This use of force was unnecessary and excessive.  Defendant Butt patted Mr. Jett down, including his left and right legs, and did not find a gun on Mr. Jett (one was allegedly used in the robbery). Officers then continued to look for the alleged gun used in the carjacking and retraced Mr. Jett's path, but they did not find anything.

39.     Approximately 15 minutes after Officer Reed ran Mr. Jett over, and several officers had already searched Mr. Jett's person, Officer Jones claims to have found "a black Airsoft BB gun in Mr. Jetts's pants" near his left ankle.

40.     The available camera footage clearly shows that Mr. Jett was wearing a tight white tank top, light blue jeans, and tight socks that were pulled up onto his calf.  No weapon is visible in the video.

41.     Officer Nero, in Foxtrot, requested a medic.  Baltimore City Fire Department Medic #38 responded and transported Mr. Jett to the University of Maryland Shock Trauma for treatment.

42.     Mr. Jett was ultimately diagnosed with a pulmonary contusion of both lungs with pneumothorax on the left lung, free fluid in his pelvis area, and a "likely" concussion.  In other words, the impact of Officer Reed's vehicle caused blood and other fluids to leak into the lung tissue of both of Mr. Jett's lungs, making it very difficult for Mr. Jett to get enough oxygen from the air that he was breathing in.  It also caused air to escape from his left lung into the space around it inside of his chest causing his left lung to collapse, furthering Mr. Jett's difficulty breathing.  Mr. Jett described his head as feeling like it was "swimming" once he regained consciousness at Shock Trauma.  For several months after the incident, Mr. Jett experienced severe pain in his lower extremities and had to attend physical therapy, and he continues to experience lasting mental and emotional distress.  Mr. Jett has reported that his memory has been much worse since the incident.

43.     Mr. Jett never regained consciousness while at the scene of the incident.  When Mr. Jett eventually regained consciousness in the back of an ambulance, he immediately complained of severe pain to his lower extremities.

44.    Mr. Jett was subsequently transported to CBIF and charged accordingly with the robbery.

45.    Although he regained consciousness, Mr. Jett cannot recall anything about the events of June 14, 2021, after being run over by Defendant Reed and does not remember being taken to the hospital.  Mr. Jett's earliest recall is waking up in a jail cell the following day, June 15, 2021.

46.    Mr. Jett sent a Maryland Public Information Act (hereinafter "MPIA") request to Baltimore City Police Department on April 26, 2022, a renewed request on January 11, 2023, a second renewed request on March 14, 2025, and a third renewed request on April 18, 2025.

47.    Mr. Jett received some BWC footage of responding officers but did not receive the BWC or dashcam footage from Defendant Reed who ran over Mr. Jett, BWC footage from Defendant Butt who handcuffed and patted down Mr. Jett, or Officer James Jones who allegedly discovered the black Airsoft BB gun in Mr. Jett's pants near his left ankle and recovered the BB gun with gloves.  In the footage Mr. Jett has received, it is clear that all three of the aforementioned officers are wearing BWC at the time of the incident.

48.    Furthermore, in the Investigative Report from the BPD [21J-0020 Investigative Summary] under the "Body Worn Camera(s)" section, it states that:

> A review of Sergeant Steven Reeds Body Worn Camera (BWC) revealed Sgt. Reed responding to assist Officers in the apprehension of Mr. Devonte Jett. According to the video, at the time stamp 0:44, Sgt. Reed turns left into the alley adjacent to 1000 North Arlington Avenue. At time stamp 0:47, Sgt. Reed's BWC captures Mr. Jett's head on the right side of Sgt. Reed's patrol vehicle's A-pillar. At time stamp 0:48, Mr. Jett is no longer in view.  At time stamp 00:57, Sgt. Reed exited his vehicle activated his BWC and ran back towards the rear of his vehicle[.]

It is clear that Defendant Reed's BWC footage exists but was not provided in response to Mr. Jett's MPIA request.

49.    In the Investigative Report from the BPD [21J-0020 Investigative Summary]

under the "Body Worn Camera(s)" section, it states that:

> A review of Officer Brandon Butt's Body Worn Camera video revealed that
> Officer Butt exited his vehicle and sees Mr. Devonte Jett walking east down the
> street wearing a white t-shirt and blue jean pants.  At the time stamp 1:03, Officer
> Butt raises his departmentally issued firearm and points it toward Mr. Jett. Mr.
> Jett starts running, continuing east. . . . At time stamp 1:08, Officer Butt points his
> weapon at Mr. Jett again.  Officer Butt continues to chase Mr. Jett on foot, left
> into the alley[.]

It is clear that Defendant Butt's body cam footage exists but was not provided in response to Mr.

Jett's MPIA request.

50.    In the Investigative Report from the BPD [21J-0020 Investigative Summary]

under the "Body Worn Camera(s)" section, it states that:

> A review of Officer James Jones's Body Worn Camera video revealed at the time
> stamp 14:26; Sergeant Steven Reed advised Officer Jones that he located a
> weapon from Mr. Jett's left ankle.  At time stamp 14:43, Officer Jones placed
> gloves on and recovered a black handgun from Mr. Jett's left pant ankle area.

It is clear that Officer Jones' body cam footage exists but was not provided in response to Mr.

Jett's MPIA request.

51.    Mr. Jett also did not receive any documents recording the chain of custody for the

black Airsoft BB gun allegedly discovered at the scene (filed as property #4764981).

52.    The BPD Property Submitted a report completed by Officer Evens listed five (5)

items recovered from Mr. Jett, all of which were clothing items.

53.    Defendant Reed never completed the required Emergency Vehicle Operation

Course or any SUV-specific law enforcement driving course.

54.    BPD Emergency Vehicle Operation and Pursuit Policy 1503 clearly states that

"Members shall use sound judgement and discretion while upholding the sanctity of human life

in all instances of emergency response and pursuit" and that "Members shall operate all vehicles with the upmost care and caution . . .."

55.     BPD Emergency Vehicle Operation and Pursuit Policy 1503 also states that "Members shall use de-escalation techniques and tactics to reduce any threat or gain compliance to lawful commands without the use of force or with the lowest level of force possible".

56.     Furthermore, Policy 1503 emphasizes that "it is better to allow a suspect to temporarily escape apprehension than to jeopardize anyone's safety in a Vehicle Pursuit.  No member shall be criticized or disciplined for a decision not to engage in a Vehicle Pursuit or to Terminate an ongoing Vehicle Pursuit based on the risk involved, even in circumstances where this policy would permit the commencement or continuation of a pursuit."  BPD policies and procedures prohibit the use of a vehicle as a weapon to run someone over, especially in these circumstances.

57.     Defendants failed to adequately train and supervise Defendant Reed not to utilize unreasonable, unnecessary, disproportional, and unwarranted lethal force.  In particular, Defendants failed to train officers not to use vehicles as weapons to run over fleeing suspects who pose no threat.

58.     Defendants failed to ensure that officers, including Defendant Reed, knew, understood, and followed the BPD policies related to the use of Emergency Vehicle Operation and SUV specific law enforcement.

59.     There was no risk of imminent death or severe bodily harm to Defendant Butt, Defendant Reed or anyone else at the time Defendant Reed used his vehicle to run over Mr. Jett.

60.     BPD Use of Force (Policy 115) provides that officers may only use force that is reasonable, necessary and proportional.

61.    The Use of Force Policy specifies that "[t]he use of Deadly Force/Lethal Force shall always be the last resort," and shall occur only when officers "reasonably believe such action is immediately necessary to protect a member or another person from an Imminent Threat of death or Serious Physical Injury."  Before using deadly force, officers "shall consider environmental considerations such as field of fire, backdrop, bystanders, potential for ricochet, possibility of overpenetration, and other risks to life."

62.    Specifically regarding fleeing individuals, officers may only use deadly force where there is probable cause to believe "the person has committed or is in the process of committing a felony involving the infliction or threatened infliction of Serious Physical Injury or death, and" escape "would pose an Imminent Threat of death or Serious Physical Injury"; "and [m]embers have identified themselves as law enforcement officers, have stated their intention to use Deadly Force/Lethal Force, and have given the person a reasonable opportunity to comply voluntarily, if time, safety, and the circumstances permit."

63.    BPD's De-escalation Policy (Policy 1107) states that its goal is "to minimize the likelihood to use force," in order to increase safety for officers and the public.  The policy describes de-escalation techniques such as communicating calmly, increasing time and distance, and avoiding physical confrontation.  It also states: "Members shall perform their work in a manner that avoids unduly jeopardizing their own safety or the safety of others through poor tactical decisions including, but not limited to, immediately approaching a subject without proper evaluation of the situation, failing to leave sufficient space between the member and the subject, closing the reactionary gap, or escalating a situation."

64.    Defendants' actions were outrageous and beyond the bounds of decency.

65.    Defendants' acts abused their power and were used to oppress Mr. Jett.

66.    Defendants' acts were a foreseeable cause of the injuries sustained by Mr. Jett.

67.    At all times relevant hereto, Defendants subjected Mr. Jett to the deprivation of his rights with actual or implied malice, in an unreasonable and unnecessary fashion.

68.    Defendants' acts shocked the conscience and amounted to an inhumane abuse of power, thereby subjecting Mr. Jett to a deprivation of his constitutional rights and privileges.

69.    At all times relevant hereto, Defendants acted without legal justification or excuse.

70.    At all times relevant hereto, Defendants acted deliberately, with ill will, improper motive, and actual malice.

71.    At all times relevant hereto, Defendants acted under color and pretense of law, and under color of statutes, customs, and usages of the State of Maryland.

72.    At all times relevant hereto, Defendants acted within the scope of their employment, with the power and authority vested in them as officers, agents, and employees of Baltimore City and the Baltimore Police Department and incident to the pursuit of their duties as officers, employees and agents of Baltimore City and the Baltimore Police Department.

73.    In the alternative, at all times relevant hereto, the Defendants—as individuals and as police officers—acted alternatively with negligence and/or gross negligence and/or intent and/or malice in violation of the lawful and constitutional duties owed Mr. Jett.

74.    As a result of the Defendants' actions, Mr. Jett suffered severe bodily injury.  Mr. Jett has suffered, and continues to suffer, mental anguish and emotional and physical pains.  To this day, Mr. Jett is unable to fully extend his left leg and experiences short-term memory loss and brain fog.

75.     As a direct and proximate result of the aforesaid conduct, actions, and inactions of Defendants, as well as those stated elsewhere herein, Mr. Jett was caused to suffer and continues to suffer mental and physical pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, loss of society, shame, and loss of enjoyment of life.  Mr. Jett was caused to suffer and continues to suffer from economic damages, including, but not limited to, lost time and wages from work, and lost earning capacity, all to his great detriment.  As a direct and proximate result of Defendants' unconstitutional acts, Mr. Jett suffered a pulmonary contusion of both lungs with pneumothorax on the left lung, free fluid in his pelvis area, and a "likely" concussion.  In other words, the impact of Officer Reed's vehicle caused blood and other fluids to leak into the lung tissue of both of Mr. Jett's lungs, making it very difficult for Mr. Jett to get enough oxygen from the air that he was breathing in. It also caused air to escape from his left lung into the space around it inside of his chest causing his left lung to collapse, furthering Mr. Jett's difficulty breathing.  Mr. Jett described his head as feeling like it was "swimming" once he regained consciousness at Shock Trauma.  For several months after the incident, Mr. Jett experienced severe pain in his lower extremities and had to attend physical therapy, and he continues to experience lasting mental and emotional distress. Mr. Jett has reported that his memory has been much worse since the incident.  He has also experienced lasting mental, physical and post-traumatic emotional distress.

76.     Mr. Jett further alleges that all of his injuries, losses and damages—past, present, and prospective—were caused solely by the actions of Defendants, as set forth above, without any negligence, want of due care, or provocation on the part of Mr. Jett, either directly or indirectly.

77.    Mr. Jett got involved with ROCA in 2023 and has since stayed active in it. ROCA is a local, Baltimore organization, who's focus is to "move the needle on urban violence by relentlessly finding and focusing on the traumatized 16-24-year-olds living at the center of it." ROCA works with "1,000 young men annually who are at the center of urban violence, traumatized and stuck. For every 10 young people who were committing violence before entering the program, 8 or 9 stay out of trouble and have no new incarcerations"[1]

78.    In the wake of the death of Freddie Carlos Gray, Jr., which was prior to the incident outlined in this Complaint, the United States Department of Justice ("DOJ") released a 163-page report[2] ("DOJ Report") outlining the BPD's pervasive pattern and practice of unlawful police conduct that violated the U.S. Constitution and federal and state laws.

79.    The DOJ report was specific, detailed, and thorough in describing the persistent and pervasive Constitutional violations committed by the BPD and its officers.  To complete its investigation, the DOJ interviewed current and former City leaders, current and former commissioners, and current and former officers.  The DOJ also participated in ride-alongs with BCPD officers and interviewed citizens of the City.  The DOJ also reviewed hundreds of thousands of pages of documents, which included, inter alia, incident reports and data from stops and arrests.

80.    The DOJ found that the pervasive and persistent pattern of Constitutional violations were not new to the BPD.  To the contrary, these violations had been going on for decades, since at least the late 1990s when the BPD began the institutionalized and widespread

---

[1] *See* ROCAinc.org (last visited December 10, 2025).
[2] *Investigation of the Baltimore City Police Department*, U.S. Department of Justice, Civil Rights Division (August 10, 2016).

practice of, inter alia, unconstitutionally using unreasonable and excessive force against city residents in violation of the Fourth Amendment.

81.     In addition to the BPD's response to the City's "zero tolerance" policy for enforcement of various laws, the DOJ report found that this pattern and practice of unconstitutional violations was driven and encouraged by systemic deficiencies in BPD's policies, training, supervision, and accountability structures, including but not limited to deficiencies in its oversight of its officers' uses of force.

82.     Further, the DOJ also reported that a significant number of incidents that it reviewed involved BPD officers using force against individuals who were fleeing from officers and who presented little or no threat of harm to the officer or to others.  Many of the incidents involved officers who chased civilians on foot, often without suspicion that the civilian had committed any serious crime.  Once engaged in the pursuit, officers then used force to end the pursuit, regardless of whether they had probable cause to conduct a stop or to make an arrest. Often, the force used to end the pursuit was disproportional to the suspected crime and the threat posed by the citizen, resulting in injury to that citizen.

83.     Moreover, the DOJ found that the BPD's training on the use of force and its Constitutional parameters was severely lacking, with it being sorely deficient at the initial levels through mandatory annual training.  The BPD training failed to provide officers with the skills necessary to use force in a safe and Constitutional manner.

84.     The BPD also lacked clear and adequate use of force policies, and its officers lacked sufficient guidance to ensure that their uses of force were consistent with Constitutional guarantees.

85.    Internally, the BPD failed to collect and analyze data regarding its officers' uses of force, and it also failed to adequately supervise its officers. The DOJ found that the BPD failed to employ policies, training, supervision, data collection, analysis, and accountability systems to ensure that officers who engaged in unconstitutional practices, such as the use of excessive force, were held accountable.

86.    Moreover, the BPD discouraged complaints from being filed, it misclassified complaints that were filed, and it conducted little to no investigation of those complaints, leading to a wholly inadequate system of investigating complaints and holding offending officers accountable.  The DOJ also found that the BPD failed to use effective methods to investigate allegations of misconduct, supervise investigations of misconduct, and failed to sustain complaints and to apply discipline consistently.

87.    In many instances of complaints of excessive uses of force, supervising officers failed to thoroughly and objectively evaluate the offending officers' use of force.  In use of force reports, inconsistencies and problematic behavior were not addressed and cover-ups routinely occurred.

88.    Ultimately, the DOJ concluded that the BPD needed significant reform to ensure that it complied with Constitutional guarantees, to which the BPD agreed.

89.    By way of example, the Foxtrot video recording of the pursuit of Mr. Jett clearly and undoubtedly shows Defendant Reed increases the speed of his vehicle as he aims the front bumper directly towards Mr. Jett and does not attempt to slow or stop until after running over Mr. Jett with his vehicle.  However, in BPD's Supplemental Report Complaint Number 1-210604338 submitted by PO Jones, J. states "The suspect fled from the vehicle and ran out on

foot until he ran into a marked patrol vehicle. The suspect was injured as a result and taken into custody by additional officers".

90.    In the BPD Investigative Report under "Involved Officer Statement", Defendant Reed states:

> Mr. Jett ran down an alley (Arlington Avenue) and he drove down the alley behind him. Mr. Jett turned right into a tall grassy field and Sgt. Reed turned the vehicle behind him. Sgt. Reed stated he heard a thump, as if he ran over something, upon exiting his vehicle, Sgt. Reed stated he was advised by Foxtrot he struck Mr. Jett.
>
> Sgt. Reed stated in real time that he couldn't determine how his vehicle came in contact with Mr. Jett, it was his intention to cut Mr. Jett off. Sgt. Reed stated he was behind Mr. Jett and when he followed Mr. Jett into the alley, however when Mr. Jett turned right into the field, he turned right into the field, and he felt Mr. Jett stepped into the path of his vehicle. It wasn't until Foxtrot advised him that he ran over Mr. Jett did he know that he ran over Mr. Jett.
>
> Sgt. Reed stated that because he knew Mr. Jett had just committed an armed carjacking and his action of grabbing his waistband for what he thought was a weapon that could cause harm to him or any other officer or citizen gave him the authority to use force with his vehicle, however, he didn't think Mr. Jett's action rose to the level that he should use his vehicle to combat Mr. Jett's threat. Sgt. Reed stated he was hoping Mr. Jett gave up and his vehicle coming in contact with Mr. Jett was unintentional. Sgt. Reed stated that when he attempted to cut Mr. Jett off, allowing his vehicle to be used as a roadblock, to stop Mr. Jett's from further eluding police, not intending to strike Mr. Jett to stop him from eluding police. Sgt. Reed did not see a handgun prior to his vehicle coming in contact with Mr. Jett.

91.    In the Foxtrot aerial footage, Mr. Jett does not appear to reach into his waistband as reported by Defendant Reed—it is clear Mr. Jett is running at full speed, pumping both of his arms in his sprint.

92.    In sum, the BPD lacked meaningful reporting and investigation systems to deter and/or address officer misconduct. As a result, resistance to accountability persisted, and officers, like Defendant Reed, knew that his use of his automobile to inflict unconstitutional

18

excessive force would not be adequately scrutinized, thus empowering them to abuse their authority.

93.     In April of 2010, BPD Sergeant Wayne Jenkins initiated a traffic stop which escalated into a vehicle pursuit of Umar Burley and Brent Matthews.  The vehicle pursuit resulted in traffic fatalities, for which Mr. Burley and Mr. Matthews were initially prosecuted for—but their convictions were later vacated due to the illegal actions of the arresting officers.

94.     On March 26, 2014, BPD Sergeant Wayne Jenkins and Officer Ben Frieman were on patrol in an unmarked vehicle when they began following Demetric Simon as Mr. Simon was driving in Baltimore City.  They followed Mr. Simon for some time and never activated their emergency lights to initiate a traffic stop.  At some point during this interaction, a degree of separation was created between the police vehicle and Mr. Simon's vehicle due to traffic conditions.  During this degree of separation Mr. Simon parked his car and exited the vehicle.  Mr. Simon then walked through someone's yard and up onto the porch.  As he did, he turned to see Sergeant Jenkins' unmarked vehicle bearing down at him at a high rate of speed.  The unmarked vehicle then launched up the curb and *landed directly on top of Mr. Simon's person*.  It was later determined that Sergeant Jenkins had the falsified probable cause for the arrest and had planted evidence on Mr. Simon in order to justify the vehicular assault.

95.     In April of 2014, Tyquan Ford was riding his dirt bike in the streets of Baltimore City.  Mr. Ford was then struck by a police car which launched him from his dirtbike and caused serious injuries.  After separating him from his dirt bike, officers tazed Mr. Ford.  Ultimately no charges were filed against Mr. Ford in regard to the incident.

96.     On April 12, 2018, BPD officers initiated a vehicle pursuit in Southwest Baltimore.  At some point during the pursuit the driver exited the vehicle and began to flee on

foot.  Immediately upon exiting his vehicle, the suspect was driven into by one of the pursuing officers' vehicles and was pinned between the pursuing vehicle and a parked car.  The suspect was then able to maneuver his body out of the pinch point and proceeded to continue to flee on foot.  After taking approximately twenty (20) steps in his flight, an unmarked BPD vehicle struck the suspect which caused his body to flip over the car and onto the pavement.  After he was struck the suspect was subdued by officers.  The officer made the choice to use his vehicle to stop this suspect, despite numerous officers being on scene and on foot in the immediate vicinity.

97.     On June 14, 2021, police were engaged in pursuit with Davonte Jett, a suspect alleged to have stolen a car.  Eventually, Mr. Jett existed the vehicle and began to flee from police on foot.  Although several officers were in the immediate vicinity and conducting an active foot pursuit, Defendant Officer Reed decided to aim the police vehicle he was operating at Mr. Jett and accelerated—running his body over with the car.

98.     As recently as October 28, 2025, a uniformed Baltimore Police Department officer driving a marked patrol vehicle pursued a teenage male who was running on foot through a residential neighborhood. Video of the incident shows the officer repeatedly steering off paved surfaces into a driveway, grassy area, and sidewalk following directly behind the teenager at a high rate of speed, very clearly trying to run the teenager over, while the teenager attempts to flee on foot.  The officer struck the man in a grassy area and continued driving at him through private property, ultimately crashing through a fence.

99.     In 1992, Kenneth Mumaw was falsely arrested, handcuffed and placed unsecured into a wagon that proceeded to the Northern District Police Station at a high rate of speed.  As a result of his "rough ride" a jury awarded him 100,000 dollars in damages.

100. In 1997, the city of Baltimore settled a lawsuit brough by Jeffery Alston for six (6) million dollars. Mr. Alston was paralyzed from the waist down after his unsecured trip in the transport wagon.

101. In 2005, Dondi Johnson Sr. was arrested for public urination. Thereafter he was placed unsecured in a transport wagon. He too became paralyzed as the result of this incident and brought forth a lawsuit against the city. A jury awarded him seven (7) million dollars.

102. On April 15, 2015, Freddie Carlos Gray Jr. was arrested and placed unsecured into the back of police wagon. Approximately thirty (30) minutes later paramedics were summoned to take Mr. Gray to the hospital. Four days later, on April 19, 2025, Mr. Gray was dead. A medical expert who examined the injuries stated that it looked as though he had taken a headfirst dive into a shallow pool.

103. The death of Mr. Gray sparked protests around Baltimore and raised questions on the practice of "rough riding." It was at this time discovered that Baltimore transport wagons had the following slogan written on the interior of the van in the area where suspects would be placed: "ENJOY THE RIDE CUZ WE SURE WILL!"

104. The pattern and practice of constitutional violations, specifically using automobiles to inflict unconstitutional excessive force, was and continues to be, rooted in the lack of supervision, oversight, and the tacit condonation of the use of excessive force by the BPD and its supervising officers. The repeated and persistent constitutional violations manifested in the widespread use of unreasonable force by BPD officers, like Defendant Reed, in violation of Articles 24 and 26 of the Maryland Declaration of Rights.

105. Under Section 5-303 of the Courts and Judicial Proceedings Article (the Local government Tort Claims Act or "LGTCA"), "a local government shall be liable for any judgment

against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government [and] [a] local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee established in this subsection." Defendant BPD is sued in its own right in connection with the *Monell* and *Longtin* counts and as indemnitor in connection with all other counts in which it is listed as a defendant below.

106.    Defendant Baltimore City has a contract with the police union which covers the individual Defendants in this case. Specifically, Art. 14 (Protection Against Liability), provides that, "[t]he City will provide indemnification to any employee who is made a defendant in litigation arising out of acts within the scope of their employment that results in a monetary judgment being rendered against the employee." Defendant Baltimore City is sued only as indemnitor in connection with counts in which they are listed as a Defendant below.

<u>**COUNT I**</u>
**42 USC 1983 – 4th & 14th Amendment Excessive Force**
**(Versus Defendants Reed and Butt with BPD and Baltimore City as indemnitors)**

107.    Every paragraph not falling under this Count is incorporated herein by reference.

108.    The Fourth Amendment of the Constitution of the United States protects citizens against unreasonable search or seizure, including protection against excessive force. These constitutional protections are applied to the states and their political subdivisions under the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C. § 1983.

109.    At all relevant times, Defendants Reed and Butt acted under color of State law and under his authority as a Baltimore City police officer.

110.    Defendants Reed and Butt deprived Plaintiff of his rights under the Fourth Amendment of the Constitution of the United States by using excessive force against Plaintiff.

111.    At the time Defendant Butt pointed his gun and Defendant Reed ran Plaintiff over, Plaintiff was not a threat to the safety of Defendant Reed, the other officers on scene, or any other person.

112.    Despite the fact that Plaintiff was not a threat to any person's safety, Defendant Butt pointed a gun at him twice and Defendant Reed ran Plaintiff over with his BPD-issued SUV.

113.    Defendants Butt and Reed also deprived Plaintiff of his Constitutional rights by the actions otherwise detailed herein, including, but not limited to:

        a.    failure to comply with BPD policies and procedures;

        b.    utilization of unreasonable, unnecessary, disproportionate, and unjustified excessive force;

        c.    utilization of excessive force without reason to believe that deadly force was necessary, as Plaintiff posed no threat when force was used; and

        d.    unjustifiable utilization of force against a fleeing individual, when he with no reason to believe that Plaintiff's escape would pose an imminent threat of death or serious physical injury and with knowledge of the risk of death officers posed to the Plaintiff.

114.    Plaintiff had the right to be free from excessive force by Defendants.

115.    Defendants' conduct constituted an utter disregard for the established and manifest Fourth Amendment rights of Plaintiff, to the point that Plaintiff was treated as if those rights did not exist, even though Defendants knew, or should have known, of the existence of those rights. In the alternative, Defendants' conduct constituted a knowing and intentional violation of Plaintiff's Fourth Amendment rights.

116.    As a direct and proximate result of Defendants' failures and breach of duties owed to Plaintiff, Defendants unreasonably, unnecessarily, disproportionately, and unjustifiably utilized excessive force against Plaintiff which resulted in Plaintiff experiencing severe physical and emotional injury.

117.    Defendants BPD and Baltimore City are sued in this count only as statutory and contractual indemnitors of the individual Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

### <u>COUNT II</u>
**Maryland Declaration of Rights, Article 24 and 26 – Excessive Force**
**(Versus Defendants Butt, Reed with BPD and Baltimore City sued in their own right under a theory of respondeat superior and as indemnitors)**

118.    Every paragraph not falling under this Count is incorporated herein by reference.

119.    The Maryland Declaration of Rights protects citizens against unreasonable search or seizure and excessive force.

120.    At all relevant times, Defendants Reed and Butt acted under color of State law and under his authority as a Baltimore City police officer and within the scope of his duties.

121.    Defendants Reed and Butt deprived Plaintiff of his rights under Articles 24 and 26 of the Declaration of Rights by using excessive force against Plaintiff.

122.    At the time Defendant Butt pointed his gun and Defendant Reed ran Plaintiff over, Plaintiff was not a threat to the safety of Defendant Officers, the other officers on scene, or any other person.

123.    Despite the fact that Plaintiff was not a threat to any person's safety, Defendant Butt pointed a gun at him twice and Defendant Reed ran Plaintiff over with his BPD-issued SUV.

124.    Defendants Butt and Reed also deprived Plaintiff of his Constitutional rights by the actions otherwise detailed herein, including, but not limited to:

e.    failure to comply with BPD policies and procedures;

f.    utilization of unreasonable, unnecessary, disproportionate, and unjustified excessive force;

g.    utilization of excessive force without reason to believe that deadly force was necessary, as Plaintiff posed no threat when force was used; and

h.    unjustifiable utilization of force against a fleeing individual, when he with no reason to believe that Plaintiff's escape would pose an imminent threat of death or serious physical injury and with knowledge of the risk of death officers posed to the Plaintiff.

125.    Plaintiff had the right to be free from excessive force by Defendants.

126.    Defendants' conduct constituted an utter disregard for the established rights of Plaintiff, to the point that Plaintiff was treated as if those rights did not exist, even though Defendants knew, or should have known, of the existence of those rights. In the alternative, Defendants' conduct constituted a knowing and intentional violation of Plaintiff's rights.

127.    As a direct and proximate result of Defendants' failures and breach of duties owed to Plaintiff, Defendants unreasonably, unnecessarily, disproportionately, and unjustifiably utilized

excessive force against Plaintiff which resulted in Plaintiff experiencing severe physical and emotional injury.

128.    Defendants BPD and Baltimore City are liable for the conduct of their employees when those employees violate the Maryland Declaration of Rights.  All conditions for *respondeat superior* liability have been met.  Defendants BPD and Baltimore City are sued in this count under a theory of *respondeat superior* and as statutory and contractual indemnitors of the individual Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

### COUNT III
**Battery**
**(Versus Defendant Reed with BPD and Baltimore City as indemnitors)**

129.    Every paragraph not falling under this Count is incorporated herein by reference.

130.    Defendant Reed, as an agent and/or employee of Defendant BPD and Baltimore City, ran over Plaintiff with a BPD-issued vehicle, subjecting him to severe bodily injury.

131.    The actions described herein constitute an intentional touching of Plaintiff without justification and causing significant injury.

132.    Plaintiff did not consent to the actions of Defendants' agents or employees.

133.    Defendants BPD and Baltimore City are sued in this count only as statutory and contractual indemnitors of the individual Defendants.

26

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## COUNT IV
**Gross Negligence**
**(Versus Defendant Reed with BPD and Baltimore City as indemnitors)**

134.    Every paragraph not falling under this Count is incorporated herein by reference.

135.    Defendant Reed owed a duty to act reasonably towards Plaintiff, including, but not limited to, acting within constitutional bounds and complying with all other legal obligations.

136.    Defendant Reed's duties to Plaintiff included, but are not limited to:

a)    Complying with Defendants' policies and regulations to ensure that law enforcement officers carry out their job duties in a legal and constitutional manner;

b)    Ensuring that the only force used in any encounter with a civilian is reasonable, necessary, and proportional;

c)    Utilizing deadly force only as a last resort and only when an officer reasonably believes such action is immediately necessary to protect themselves or another person from an imminent threat of death or serious physical injury;

d)    Utilizing deadly force against a fleeing individual only when the person's escape would pose an imminent threat of death or serious physical injury; and

27

e)     Adequately, competently, and continuously assessing each situation and changing the officer's response as the circumstances change, as even if force is justified in one instant, force may not be justified an instant later.

137.    Defendant Reed acted with gross negligence when he failed to comply with these duties, as described herein, which wrongfully caused Plaintiff to suffer severe physical and mental injuries.

138.    These failures included, but are not limited to:

a)     Defendant Reed's failure to comply with Defendants' policies and regulations and ensure that he carried out his job duties in a legal and constitutional manner;

b)     Defendant Reed's utilization of unreasonable, unnecessary, disproportionate, and unjustified excessive force;

c)     Defendant Reed's utilization of excessive force when he had no justifiable reason to believe that deadly force was necessary to protect himself or any other person against an immediate and imminent threat of death or serious physical injury, as Plaintiff posed no threat to Defendant Reed or any other person at the time Defendant Reed ran Plaintiff over with his BPD-issued SUV; and

d)     Defendant Reed's unjustifiable utilization of deadly force against a fleeing individual, when he had no reason to believe that Plaintiff's escape would pose an imminent threat of death or serious physical injury and he knew that running over a pedestrian is never a safe or effective means of stopping a pedestrian and could kill the pedestrian.

139.    By knowingly, intentionally, and/or with reckless disregard committing such failures and breach of duties owed to Plaintiff, Defendant Reed was acting with wanton and willful disregard of Plaintiff's rights as if such rights did not exist.

140.     Defendant Reed's conduct, actions, and inactions constituted an intentional failure to perform his duty in reckless disregard of the consequences affecting Plaintiff's life or property. Defendant Reed exhibited a thoughtless disregard of the consequences of his actions without any effort to avoid such consequences.

141.     In the alternative, Defendant Reed was so utterly indifferent to Plaintiff's rights that he acted as if such rights did not exist, resulting in Plaintiff experiencing severe physical and emotional injury.

142.     Defendants BPD and Baltimore City are sued in this count only as statutory and contractual indemnitors of the individual Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## COUNT V
### Negligence
**(Versus Defendants Butt and Reed with BPD, and Baltimore City as indemnitors)**

143.     Every paragraph not falling under this Count is incorporated herein by reference.

144.     Defendants Butt and Reed owed a duty to act reasonably towards Plaintiff, including, but not limited to, acting within constitutional bounds and complying with all other legal obligations.

145.     Defendants Butt's and Reed's duties to Plaintiff included, but are not limited to:

a)      Complying with Defendants' policies and regulations to ensure that law enforcement officers carry out their job duties in a legal and constitutional manner;

b)      Ensuring that the only force used in any encounter with a civilian is reasonable, necessary, and proportional;

c)      Utilizing deadly force only as a last resort and only when an officer reasonably believes such action is immediately necessary to protect themselves or another person from an imminent threat of death or serious physical injury;

d)      Utilizing deadly force against a fleeing individual only when the person's escape would pose an imminent threat of death or serious physical injury; and

e)      Adequately, competently, and continuously assessing each situation and changing the officer's response as the circumstances change, as even if force is justified in one instant, force may not be justified an instant later.

146.    Defendants Butt and Reed failed to comply with these duties, as described herein, which wrongfully caused Plaintiff to suffer severe physical and mental injuries.

147.    These failures included, but are not limited to:

a)      failure to comply with Defendants' policies and regulations and ensure that he carried out his job duties in a legal and constitutional manner;

b)      utilization of unreasonable, unnecessary, disproportionate, and unjustified excessive force;

c)      utilization of excessive force without any justifiable reason to believe that deadly force was necessary to protect himself or any other person against an immediate and imminent threat of death or serious physical injury, as Plaintiff posed no threat when force was used; and

d)      Defendant Reed's failure to maintain sufficient control of his vehicle to stay on the roadway and avoid hitting Plaintiff.

148.    Defendants BPD and Baltimore City are sued in this count only as statutory and contractual indemnitors of the individual Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

<u>**COUNT VI**</u>
*Monell* **Pattern or Practice of Improper Conduct – 4th Amendment Excessive Force**
**(Against Defendant BPD)**

149.    Every paragraph not falling under this Count is incorporated herein by reference.

150.    At all relevant times herein, Plaintiff had rights under the Fourth Amendment not to have his person or property unlawfully seized in an unreasonable manner, not to be deprived of his liberty without due process of law, not to be summarily punished, and not to be subjected to the use of unreasonable and excessive force.

151.    It is established now and was clearly established at the time of Defendant Reed's actions that the conduct, pattern, and practices of Defendants BPD violated the Fourt Amendment to the U.S. Constitution.

152.    Defendant Reed, while acting under color of law, deprived Plaintiff of his clearly established and well-settled rights under the Fourth Amendment of the U.S. Constitution not to be subjected to the use of unreasonable and excessive force.

153.    As alleged herein, the actions by Defendant Reed were objectively unreasonable, excessive, absent any lawful justification and/or excuse, and were in keeping with the pattern practice, policy and/or custom of Defendant BPD.

154.    Under the Fourth and Fourteenth Amendments to the United States Constitution, Defendant BPD is prohibited from allowing, enabling, and facilitating its officers to engage in a pattern, practice, policy, or custom of violating citizens' constitutional rights and are obligated to train and supervise Baltimore City police officers in the recognition and handling of incidents of misuse of police powers and rights violations committed by Baltimore City police officers, as well as recognizing patterns of systemic perpetuation of the same.

155.    Baltimore City police officers, including Defendant Reed, persistently engaged in a widespread practice of unconstitutional conduct of unlawfully using excessive force against citizens.  It was of such a duration and frequency such that it had become customary and standard operating procedure among Baltimore City police officers, and Defendant BPD knew or should have known of the widespread violations.

156.    By establishing, executing, implementing, enforcing, directing, supervising and/or controlling polices, customs, practices, usages, and procedures to be used by Defendant BPD's officials and officers, Defendants, while acting under color of law, engaged in a pattern and practice of unconstitutional conduct.

157.    Thus, the deprivation of Plaintiff's rights, as described herein, represents not a single isolated, accidental, or peculiar event, but occurrences in the regular procedures followed by these officers, constituting an illegal pattern or practice of such conduct.

158.    Defendant BPD engaged in a pattern, practice, policy, or custom of allowing, enabling, and/or facilitating Baltimore City police officers using automobiles to inflict unconstitutional excessive force.

159.    At all relevant times, Defendant BPD maintained a custom, policy, and/or practice of condoning officers' conduct in knowingly, consciously, and repeatedly failing to stop or correct the widespread pattern of unconstitutionally using automobiles to inflict unconstitutional excessive force.

160.    Defendant BPD, through specific intent or deliberate indifference, failed to correct and otherwise hold Defendant Reed and other Baltimore City police officers accountable for their abuse of police powers and continued and repeated unconstitutional uses of force and unlawful seizures.  By failing to correct the officers' pervasive constitutional violations, including Defendant Reed, Defendant BPD condoned the pattern and practice of using automobiles to inflict unconstitutional excessive force by its officers, including Defendant Reed.

161.    In addition, Defendant BPD caused their employees to believe that conducting their law enforcement activities unconstitutionally, illegally, and in violation of BPD's policies and regulations would not be aggressively, honestly, and properly investigated.

162.    Defendant BPD should have foreseen that such policies would promote the proliferation of constitutional violations of citizens' rights, without justification, due process, or probable cause.

163.    Defendant BPD acted with reckless disregard for or with deliberate indifference to whether Plaintiff's rights would be violated by their actions and that such actions were the moving force in violating Plaintiff's rights.

164.    Defendant BPD have failed to take even elementary steps to protect citizens from the type of abuses detailed herein.  BPD failed to establish proper policies and procedures to prohibit and prevent the unconstitutional use of vehicles to inflict excessive force.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

### COUNT VII
#### *Longtin* Pattern or Practice of Improper Conduct
#### Article 24 and 26 Excessive Force
#### (Against Defendant BPD)

165.    Every paragraph not falling under this Count is incorporated herein by reference.

166.    Plaintiff's constitutional rights were violated as described elsewhere herein.

167.    Defendant BPD is responsible for setting policy and procedures governing the conduct of Baltimore City police officers.

168.    Defendant BPD maintained policies, customs, patterns and practices in the Baltimore City police department of violating the constitutional rights of people in Baltimore City to be free from unreasonable and excessive force.

169.    Defendant BPD's policies, customs, patterns and practices of violating the constitutional rights of people in Baltimore City were the actual direct and proximate cause, as well as the moving force, behind the violation of Plaintiff's constitutional rights.

170.    The above-described policies, customs, patterns and practices of Defendant BPD are so widespread as to rise to the level of official policy promulgated by Defendants.

34

171.    Defendant BPD failed to ensure that their police officers conducted their law enforcement activities within constitutional bounds.  Further, Defendant BPD has permitted and tolerated a pattern and practice of unjustified, unreasonable, and unlawful abuses of their officers' law enforcement authority, constituting a pattern or practice of law enforcement officers employed by Defendant BPD conducting their law enforcement activities unconstitutionally. This unconstitutional pattern or practice has resulted in officers employed by Defendant BPD to consistently and continuously violating citizens' constitutional rights, including using automobiles to inflict unconstitutional excessive force.

172.    Thus, the deprivation of Plaintiff's rights, as described herein, represents not a single isolated, accidental, or peculiar event, but occurrences in the regular procedures followed by these officers, constituting an illegal pattern or practice of such conduct.

173.    Defendant BPD is aware of, or, in the alternative, should have been aware of, the illegal pattern or practice of their officers conducting their law enforcement activities unconstitutionally.

174.    In addition, Defendant BPD caused their employees to believe that conducting their law enforcement activities unconstitutionally would not be aggressively, honestly, and properly investigated by failing to adequately discipline officers engaging in such misconduct.

175.    Defendant BPD has instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage employees to violate the rights of citizens.

176.    This is a result of Defendant BPD's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that such violations do not occur and to ensure that allegations of such violations will be thoroughly investigated and appropriately punished when

35

found to have occurred.  As a result of this failure, there has been a regular pattern and practice

of conduct similar to that complained of here.  This pattern and practice has been manifested in

other prior incidents against Defendant BPD, as outlined herein.

177.    Defendant BPD has failed and refused to take even elementary steps to protect

citizens from the type of abuses detailed above.

178.    The policies and customs of Defendant BPD, as set forth herein, demonstrate a

gross disregard for the constitutional and other rights of the public and Plaintiff, and were a

proximate cause of Plaintiff's severe physical and emotional injury.

179.    In addition to the affirmative policy of unconstitutionally utilizing excessive force

as described above, Defendant BPD maintains policies, customs, patterns, and practices of

inadequately training officers to avoid unconstitutionally utilizing excessive force.

180.    This failure to train officers to avoid unconstitutionally utilizing excessive force

amounts to deliberate indifference to the rights of persons with whom the police come into

contact.

181.    The training and retention procedures of Defendant BPD are so inadequate as to

demonstrate deliberate indifference in adopting the hiring and training policies and these

inadequate hiring or training policies directly caused Plaintiff's injuries.

182.    Defendant BPD had actual and constructive knowledge of continuing

constitutional violations and failed to carry out their duty to correct them.

183.    Defendant BPD has both explicitly and tacitly approved of the type of misconduct

of police officers which is the subject of this lawsuit.

184.    Dozens of people have sued Defendant BPD over the type of misconduct of

police officers which is the subject of this lawsuit.  Many more individuals have been subjected

to unconstitutional excessive force by Baltimore City police officers who have not filed claims. Examples of prior misconduct are outlined in the fact section herein.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## COUNT VIII
### Negligent Training and Supervision
### (Versus Defendants BPD and Baltimore City)

185.    Every paragraph not falling under this Count is incorporated herein by reference.

186.    Defendants had a duty to ensure that BPD's officers were trained to conduct their law enforcement activities within constitutional and lawful bounds and a duty to discipline and/or fire officers who failed to conduct their law enforcement activities in a constitutional manner.

187.    Defendants breached their duty to train Defendants Reed and Butt in the constitutional and legal limits of their police authority, which led Defendants Reed and Butt to believe that they could unlawfully use excessive force against Plaintiff and directly and proximately caused the tortious and unconstitutional misconduct described herein, as well as the injuries described above.  Such a breach constitutes negligence.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00 plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, and such other and further relief as the

nature of the case requires including, but not limited to, declaratory and injunctive relief declaring the conduct which is the subject of the Complaint unlawful and unconstitutional and enjoining future unlawful and unconstitutional misconduct of the same type.

## JURY DEMAND

Plaintiff demands a jury trial as to all claims so triable.

Respectfully submitted,

HANSEL LAW, PC

*/s/ Kristen M. Mack*
_____
Cary J. Hansel (Bar No. 14722)
Kristen M. Mack (Bar No. 30638)
2514 N. Charles Street
Baltimore, Maryland 21218
Phone:     301-461-1040
Facsimile: 443-451-8606
cary@hansellaw.com
kmack@hansellaw.com
*Counsel for Plaintiff*